UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>ULTRA PETROLEUM CORP., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No.: 16-32202<br><br>(Jointly Administered) |
| GASCONADE OIL CO., RIGGS OIL & GAS CORPORATION, THE ROY H. DUBITZKY TRUST DATED JUNE 28, 1996, ROY H. DUBITZKY TRUSTEE<br><br>      Plaintiffs<br><br>v.<br><br>ULTRA RESOURCES, INC., UPL PINEDALE, LLC<br><br>      Defendants | Adversary No. 17-3019 |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE DORSEY T. ROACH AS AN EXPERT WITNESS**

On March 2, 2018, Plaintiffs filed their Motion to Strike Dorsey T. Roach as an Expert Witness. Below is Ultra Resources and UPL Pinedale's reply.

**I.     Plaintiff's Motion to Strike**

Plaintiffs filed their Motion to Strike (the "Motion") Ultra Resources and UPL Pinedale's sole expert witness, Mr. Dorsey Roach. Mr. Roach's expert report, which addresses custom and practice in the oil and gas industry based on his

extensive experience in the fields he addresses, opines that (1) the obligation of CNG Producing Company to assign an interest in newly acquired leases within certain areas to the Plaintiffs did not accrue to Ultra Resources; (2) creation of a new subsidiary in connection with and for the purpose of concluding an acquisition of oil and gas properties is common in the oil and gas industry; (3) the obligation to assign overriding royalty interests created by the 1994 Fossil / CNG agreement, if any, applies only to undeveloped leases (and not to acquisitions of producing properties); and (4) an instrument which (x) purports to impose an obligation on one party to convey an interest to another party burdening lands that may or may not be acquired, (y) does not relate only, exclusively, and permanently to an identifiable parcel of land when the obligation was created, and (z) is not for a finite, identifiable period, has been considered by the industry to violate the rule against perpetuities.

Plaintiff's Motion is based on their argument that Mr. Roach should not be permitted to testify about industry custom and practice as related to "unambiguous contracts" that contain no unique terms; that, since he has no experience in the formation of entities, he should not be able to testify about oil and gas companies setting up subsidiaries or affiliates to take title to properties acquired in large acquisitions. Lastly, they state that, since the issue of the rule against perpetuities is a legal issue, he should not be able to testify about the custom and practice of the industry when dealing with contracts of the nature at issue here.

II.   **The Law Regarding Expert Testimony**

*A. The Admission of Expert Testimony under Fed. R. Evid. 702*

The Supreme Court of the United States acknowledged in *Daubert v. Merrell Dow Pharmaceuticals* that Federal Rule of Evidence 702 is the proper standard for determining the admissibility of expert testimony. *Daubert* v.

2

*Merrell Dow Pharms.*, 509 U.S. 579, 597–98, 113 S. Ct. 2786 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> the testimony is based on sufficient facts or data;
>
> the testimony is the product of reliable principles and methods; and
>
> the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under *Daubert*, a trial court acts as a "gatekeeper," making a "preliminary assessment of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93; *see also Kumho Tire v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167 (1999); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (5th Cir. 2002). *Daubert* and its principles apply to both scientific and non-scientific expert testimony. *Kumho Tire*, 526 U.S. at 147. Experts need not be highly qualified to testify, and differences in expertise go to the weight of the testimony, rather than admissibility. *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). Nonetheless, courts need not admit testimony that is based purely on the *ipse dixit* of the expert. *Gen. Elec. Co. v. Joinder*, 522 U.S. 136, 146, 118 S. Ct. 512 (1997) *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir.

In addition to being qualified, an expert's methodology for developing the basis of his or her opinion must be reliable. *Daubert*, 509 U.S. at 592–93; *Moore*, 151 F.3d at 276. "The expert's assurances that he [or she] has utilized generally accepted scientific methodology is insufficient." *Moore*, 151 F.3d at 276. Even if the expert is qualified and the basis of his or her opinion is reliable, the underlying methodology must have also been correctly applied to the case's particular facts in order for the expert's testimony to be relevant. *Daubert*, 509 U.S. at 593; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). The party proffering expert testimony has the burden of establishing by a preponderance of the evidence that the challenged expert testimony is admissible. *See* Fed. R. Evid. 104(a); *Moore*, 151 F.3d at 276. The proponent does not have to demonstrate that the testimony is correct, only that the expert is qualified and that the testimony is relevant and reliable. *Moore*, 151 F.3d at 276.

### B. The Admission of Expert Testimony on Custom and Practice

The Fifth Circuit spoke on the admissibility of expert testimony on custom and practice in *Musket Corporation v. Suncor Energy (U.S.A.) Marketing, Inc.,* 2016 WL 7374225 (5th Cir. 2016). Musket claimed that Suncor was to deliver crude oil as required by an Agreement between them and Suncor claimed that Musket's claims were barred by an "Interruption" clause in the Agreement. Both parties moved to exclude the expert of the other. The opinion addressed the motion to exclude. The court held that "it is well-settled that expert testimony concerning industry practices and standards, as it relates to contract interpretation is permissible."

4

In *Ergon-West Virginia, Inc. v. Dynegy Marketing & Trade,* 2011 WL 765555 (U.S.D.C. Mississippi, 2011), the issue was the interpretation of a force-majeure claim invoked by Dynegy after, Dynegy claimed, Hurricanes Katrina and Rita in 2005, interrupted its gas supply. The court ruled the contract ambiguous and ruled that expert testimony on custom and practice is allowed, citing *First United Fin. Corp. v. U. S. Fidelity & Guar. Co.,* 96 F.3d 135, 148 (5th Cir.1996).

The case of *Dickson v. Sklarco L.L.C.*, 2014 WL 4443423 (W.D.La. 2014) involved the interpretation of two oil and gas leases, which the court held, due to inconsistencies between the language in the printed form and the language in the attached addendum to be ambiguous. Having found the provisions ambiguous, the court held that "the Court may consider the custom of the oil and gas industry to determine the true intent of the parties, as well as extrinsic evidence, including expert testimony, to determine such industry custom." The court also held that the expert could assist the court in determining the meaning of the words used "in the context of the oil and gas industry."

In *Abraham v. WPX Production, LLC*, 184 F.Supp.3d 1150, the court was faced with the issue of competing experts related to the issue of the payment of royalties on natural gas liquids. The plaintiffs' expert was to provide the court an analysis of the leases and that "none of the leases have language that authorizes WPX to fail to report and pay royalties on NGLs." The Court concluded that plaintiffs' expert "could provide useful factual information".[1] As did the defendants, the plaintiffs moved to exclude the testimony of defendants' expert. They argued that the expert's opinions did not offer "custom and usage opinion testimony." The court disagreed and determined that "it was inclined to allow

---

[1] *Id. p. 1172.*

testimony, because experts can usually discuss custom and usage within an industry."[2]

It is clear that expert testimony on contracts used in the oil and gas industry may be ambiguous without any use of unique terms, contrary to the argument of plaintiffs. In *Wadi Petroleum, Inc. v. Ultra Resources, Inc.,* 65 P.3d 703 (Wy. 2003), the court was faced with an assignment of an oil and gas lease that reserved an overriding royalty of "3.125% of 8/8ths". Wadi argued that this meant that it was entitled to 3.125% of 100% of the production. Ultra argued that Wadi acquired only a .625% interest because their predecessors only owned an 20% working interest. The court agreed with the trial court that the language was ambiguous and permitted testimony on custom and usage to explain the interest, and agreed with the trial court that the interest was only a .625% interest.

In a similar case involving different parties, the Wyoming supreme court held that "In interpreting unambiguous contracts involving mineral interests, we have consistently looked to surrounding circumstances, facts showing the relations of the parties, the subject matter of the contract, and the apparent purpose of making the contract." *Double Eagle Petroleum & Mining Corporation v. Questar Exploration & Production Company,* 78 P.3d 679 (Wy. 2003).

In *Valence Operating Company v. Anadarko Petroleum Corporation,* 303 S.W.3d 435 (Tex.App.-Texarkana, 2010), the court was faced with the interpretation of a provision in a joint operating agreement. The issue was whether Valence actually commenced work on its proposed operation within the time frame required. The issue was over the meaning of the phrase "commencement of operations" in the joint operating agreement. The trial court admitted the expert testimony of Anadarko's expert witness, Barnhill, as to what is commonly

---

[2] *Id. p.* 1175.

understood by the phrase "commence work on a proposed operation" in the oil and gas industry. Valence objected. The court, in permitting the testimony, stated:

> "Barnhill is a certified professional landman who has worked in the oil and gas industry for over thirty-two years. He has served as an instructor for the American Association of Petroleum Landmen teaching landmen about oil and gas leases, joint operating agreements and related agreements, as well as standard practices in the oil and gas business. . . he testified that he was acquainted with the common understanding of 'commencement of operations' requirements of oil and gas leases and joint operating agreements. . . Barnhill's testimony . . . was about the practices in the industry with which he was familiar. Because the issue of Valence's compliance with the Joint Operating Agreement's requirement of commencement of operations was submitted to the jury, this kind of evidence was relevant and appropriate."

Thus, there is no need for any terms with unique industry trade, custom or usage meaning for expert testimony to be admissible.

**III.   Summary of Argument**

Defendants disagree with plaintiffs arguments. As discussed, Mr. Roach's testimony is appropriate and necessary because he is a recognized expert on topics for which expert testimony is needed. His testimony is necessary and relevant to assist the court in understanding the custom and practice in the oil and gas industry with respect to the scope and purpose of AMI provisions as well as the use of subsidiaries and affiliates in acquisitions and the operations of oil and gas properties. His vast experience in drafting and assisting in the creation of form documents used in the industry is relevant for the industry's perspective on obligations that have no finite ending.

7

IV. **Experience and Expertise of Dorsey Roach**

The first criteria is to determine the qualification of the proffered expert. It is no wonder plaintiffs do not want the Court to hear the testimony of Mr. Roach. As a member of the 14,000 member American Association of Professional Landmen, he has *since 1984 taught hundreds of seminars* to the AAPL members on pooling, unitization, operating agreements, well trades and participation agreements – most of which involve situations where area of mutual interest provisions are included. He was described by the court in one case as "Mr. Joint Operating Agreement."

He was the chairman of the AAPL committee that drafted the 1989 Operating Agreement, was a member of the task force that revised this version and a member of the committee that drafted the newest AAPL operating agreement form in 2015. Mr. Roach has been employed in a landman capacity for over 37 years and has worked for major companies like Exxon, the Williams Companies, and Union Pacific Resources and smaller producers such as Mesa, Inc., Crawley Petroleum and Cheyenne Petroleum. He currently has his own consulting firm named UnitPro Land Consultants.

During the last 10 years, he has authored ten (10) published articles on various topics related to petroleum land agreements, including area of mutual interest provisions. He has provided testimony in over 20 lawsuits involving petroleum land agreements and no court has determined him not qualified to testify on the topics for which he was retained. Since plaintiffs do not complain or allege that Mr. Roach is not qualified, we turn to his opinion.

V. **Background**

   A. *Misstatements of the Record*

In the General Background section of plaintiffs' Motion, they misstate the record in several respects. First of all, this is not a "dispute concerning a consulting

agreement." This is a dispute concerning a letter agreement between plaintiffs' predecessor, Fossil Associates, and CNG Producing Company titled "Southwestern Wyoming Revised CNG/Fossil Agreement" (the "Revised CNG/Fossil Agreement") and whether or not the obligation of CNG to make overriding royalty assignments to plaintiffs on newly acquired leases accrued to Ultra Resources and UPL Pinedale.

   *B. Facts*

   A brief recitation of certain facts is in order to put the expert opinions of Mr. Roach in context. In 1996, Ultra Petroleum Corp., a publicly traded company based in Canada, formed Ultra Petroleum (USA), Inc. (later merged into defendant Ultra Resources) to acquire certain oil and gas assets from CNG Producing Company, a wholly owned subsidiary of Consolidated Natural Gas Company, one of the largest natural gas distribution companies in the United States. A Purchase and Sale Agreement was entered into dated July 16, 1996, ("the CNG/Ultra Agreement") to provide for the purchase and sale.

   Certain of the leases acquired by Ultra in the CNG/Ultra Agreement were leases subject to the Revised CNG/Fossil Agreement. Over the years, Ultra Resources made assignments to plaintiffs of overriding royalty interests in those leases and in various leases Ultra Resources acquired in what the parties call the "Area of Mutual Interest (AMI)" established in the Revised CNG/Fossil Agreement.

   Pursuant to a Purchase and Sale Agreement dated August 13, 2014, among Ultra Resources, UPL Pinedale and SWEPI L.P., UPL Pinedale agreed to purchase what the agreement defined as the "SWEPI Assets" consisting of properties located in Sublette County, Wyoming, including oil and gas leases, producing wells, surface equipment and facilities necessary to produce the wells and sell such production.

Plaintiffs' claim that they are entitled to an assignment of a 5% overriding royalty interest in the leases UPL Pinedale acquired from SWEPI. Defendants dispute this claim. In addition, Ultra Resources claims that it has no obligation to make assignments of newly acquired leases to plaintiffs, and that the Letter Agreement violates the rule against perpetuities.

## VI. Opinions of Mr. Roach

### A. Custom and Practice

After a listing of the documents he reviewed, Mr. Roach states that he has formed opinions regarding the plaintiffs' allegations and claims "based upon common and accepted oil and gas industry customs and practices and include the matters set forth below."[3]

### B. AMI Provision of the Letter Agreement between Fossil Associates and Consolidated Natural Gas do not apply to Ultra Resources

Mr. Roach reviews the language used in the CNG/Ultra Agreement in which Ultra acquired certain of CNG's properties, some of which were subject to the plaintiffs' overriding royalties (ORRI). He points out that the leases, wells, equipment, flowlines, pipelines and other facilities purchased were defined as "Interests." The CNG/Ultra Agreement provides that Ultra is to comply with the Revised CNG/Fossil Agreement "insofar as the [Revised CNG/Fossil Agreement] pertains to the Interests." He then states his opinion that the Interests sold were only sold subject to the Revised CNG/Fossil Agreement to the extent that the Revised CNG/Fossil Agreement affected the Interests. While he points out that the Revised CNG/Fossil Agreement affects the Interests in several ways, it does not require or provide for Ultra to make an assignment of an overriding royalty on subsequently acquired leases that are not part of the Interests. In other words, the

---

[3] Expert Report of Dorsey T. Roach, attached as Exhibit A, page 4

Interests are not in any way burdened or affected by an obligation that would attach to new leases not already issued since such unissued leases could not be part of the acquired Interests.[4]

The primary basis for this opinion is the language of the CNG/Ultra Agreement itself and how, based on custom and practice, it would be intended to apply. Also, based on custom and practice, it is his opinion that if the parties had intended the AMI obligations (obligations with respect to new leases) to also apply to Ultra they would have inserted language to accomplish that, which they did not.[5]

CNG retained all properties, rights and interests that were not assigned to Ultra. Therefore, in Mr. Roach's opinion, CNG would have retained the obligation to assign overrides to the plaintiffs if CNG acquired any lease within the various AMIs.

### C.  UPL Pinedale LLC has no obligation to make assignments to Plaintiffs

Mt. Roach cites his long experience in the industry for his statement that the creation of related companies to make acquisitions, particularly large acquisitions like this one, is common for a variety of reasons.[6] They do so to keep the acquired assets segregated for tax reasons, potential environmental liability reasons or for unknown liability reasons. He related his personal experience in working for several companies that did just what Ultra Petroleum did here. He worked for Exxon Corporation, one of the largest corporations in the world, that acquired a company named XTO and kept XTO as a separate company. When he worked for the Williams Companies, Williams acquired Northwest Pipeline and transferred their oil and gas producing assets to a newly owned subsidiary. At Mesa

---

[4] Expert Report §10.c. and d.
[5] Expert Report, §10.e.
[6] Expert Report §10.g.

Petroleum, when it bought Tenneco's mid-Continent Division, the lenders required it to put the assets in a newly formed subsidiary.

He then stated, accurately, that he saw no evidence that indicates that UPL Pinedale was organized for anything other than legitimate business reasons and saw no evidence that its organization was done to defraud plaintiffs.

Mr. Roach states the fact that it is common in the oil and gas industry for companies to have affiliates, or subsidiaries, and other related entities established to make large acquisition of producing oil and gas properties. CNG Producing Company, a party to the CNG/Fossil Revised Agreement, was a wholly owned subsidiary of Consolidated Natural Gas, which both Fossil and CNG knew – yet there is no provision in the CNG/Fossil Agreement that provides for the obligations to be assumed by affiliates or subsidiaries.

### D. *The Obligation to Assign an Overriding Royalty to Plaintiffs' Only Applies to Undeveloped Leases*

Additionally, Mr. Roach opined that the Consulting Agreement contemplated the acquisition of undeveloped leases, primarily through the federal government's Simultaneous Oil and Gas Leasing System and, therefore, the obligation to assign of CNG would only apply to undeveloped leases. While plaintiffs do not like this part of his opinion, and cited a Kansas case holding to the contrary, Mr. Roach's opinion is supported by the statement by Professors Smith and Weaver in their treatise on Texas oil and gas law that "An AMI clause typically applies to new and additional leases covering acreage that is not already leased by the parties to the agreement."[7]

This opinion is further supported by the admission by Clifton Arbuckle that there never was a Prospect at Pinedale and that the only contribution of Fossil

---

[7] Earnest E. Smith and Jacqueline Lang Weaver, Texas Law of Oil and Gas, 2nd Edition, §16.4A (LexisNexis Matthew Bender 2015).

Associates was the acquisition of new leases that they filed for under the United States Department of the Interior, Bureau of Land Management under the Federal Simultaneous Oil and Gas Leasing System.[8]

### E. The Rule Against Perpetuities (the "Rule")

Mr. Roach's testimony and report, as it applies to the Rule, is his experience in teaching about area of mutual interest provisions and his experience in reviewing such provisions. He testified that the industry uniformly limits the duration of area of mutual interest provisions to a specified number of years, to specific already existing leases, or other finite time periods specifically to avoid the area of mutual interest provision being declared void due to the Rule. His testimony would assist the Court in determining the application of the Rule.

## VII. Conclusion

Since plaintiffs do not complain or assert that Mr. Roach lacks the qualifications or experience to form and assert the opinions in his expert report, the only issue is whether or not his testimony on the custom and practice in the oil and gas industry (1) of companies establishing subsidiaries or affiliates to make major acquisitions, (2) with respect to the language used in the CNG/Fossil Agreement required the assignment by CNG of an overriding royalty on non-producing properties, and (3) based on the language, or the lack of language, in the CNG/Ultra Agreement, Ultra did not assumed the obligation to make assignments of leases acquired by Ultra within the AMIs, will assist the Court in interpreting the various contract provisions. It will.

Further, his testimony on the custom and practice in the industry where agreements to make future assignments of overriding royalty interests burdening newly acquired leases are uniformly limited to a time, should assist the Court in

---

[8] See Exhibit B, attached.

showing how the industry views the application of the rule against perpetuities in the context of the provisions at issue in this case. The objections of plaintiffs go to the weight of the testimony, not its admissibility, and they will have ample opportunity during cross examination to challenge Mr. Roach's opinions.

Respectfully submitted,

FARNSWORTH & VONBERG, LLP

<u>/s/ T Brooke Farnsworth</u>
T Brooke Farnsworth
Texas Bar No: 06828000
Bennett S. Bartlett
Texas Bar No. 01842440
333 N. Sam Houston Parkway
Suite 300
Houston, Texas 777060
E-mail: Brooke@fvllp.com
E-mail: Bennett@fvllp.com
Tel: (281) 931-8902
Fax: (281) 931-6032

Anthony J. Shaheen, *admitted pro hoc vice*
Jessica M. Schmidt, *admitted pro hac vice*
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, CO 80202
Email: AJShaheen@holandhart.com
Tel: (303) 295-8054
Fax: (303) 291-9126
*Counsel for Defendants*