## UNITED STATE BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| ULTRA PETROLEUM CORP., et al | § § | Case No. 16-32202 |
| Debtor | § § § § | (Jointly Administered) |
| | § § | |
| GASCONADE OIL CO. | § § | |
| RIGGS OIL & GAS CORPORATION | § | |
| THE ROY H. DUBITZKY TRUST | § | |
| DATED JUNE 28, 1996, ROY H. | § | |
| DUBITZKY, TRUSTEE | § § | |
| Plaintiffs | § § | |
| v. | § § | Adversary No. 17-03019 |
| ULTRA RESOURCES, INC. | § § | |
| UPL PINEDALE, LLC | § § | |
| Defendants | § § § | |

## EXPERT REPORT OF DORSEY T. ROACH

DORSEY T. ROACH declares under penalty of perjury, pursuant to 28 U.S.C. §1746, as follows:

1.  My name is Dorsey T. Roach. I am over 18 years of age, of sound mind, and am otherwise competent to make this Expert Report.  The facts stated in this Expert Report are within my personal knowledge and are true and correct to the best of my belief. I was retained by Ultra Resources, Inc., a wholly-owned subsidiary of Ultra Petroleum Corporation ("Ultra

1



Resources") and UPL Pinedale, LLC ("UPL Pinedale") through their attorneys with the Farnsworth & vonBerg, LLP law firm, to provide expert opinions in the above-named and numbered cause as to the industry custom and practices with respect to relevant documents, and how they apply to the facts of this case. This Expert Report constitutes the opinions I have developed. My qualifications to provide expert opinions in this case include the following:

- I graduated from the University of Oklahoma in 1977 with a B.B.A., majoring in Petroleum Land Management (PLM). Upon graduating, I began my career with Exxon Corporation ("Exxon"). I have held various staff and management positions with Exxon, Mesa Petroleum Co., Crawley Petroleum Corporation, Union Pacific Resources Company, the Williams Cos. and Cheyenne Petroleum Company where my duties and responsibilities were primarily joint operating agreements, well trades and participation agreements. I am currently the managing member of UnitPro Land Consultants, LLC, where I offer consulting and expert witness services to the oil and gas industry.

- I am an author and have given hundreds of presentations and seminars on joint operating agreements, well trades and participation agreements to such organizations as the American Association of Professional Landmen ("AAPL"), the Southwestern Legal Foundation, the Rocky Mountain Mineral Law Foundation, the Texas, Oklahoma, Kansas and Arkansas Bar Associations, the Oklahoma Marginal Well Commission, the Oklahoma Corporation Commission and many local landmen's associations and other industry-related organizations. I also served as an adjunct professor at the University of Oklahoma (1983-2008) and Tulsa University (2007-2015) where my primary lecture topics were joint operating agreements and well trades.

- I served as Chairman of the AAPL 1989 Operating Agreement Revision Committee that drafted the AAPL Form 610-1989 Model Form Operating Agreement, and I served as a member of the AAPL Operating Agreement Task Force that drafted the AAPL Form 610-1989 (Horizontal) Model Form Operating Agreement, and the AAPL Form 610-2015 Model Form Operating Agreement.

- I currently serve as Chairman of the AAPL Participation Agreement Drafting Committee that is responsible for drafting a model form participation agreement.

- My curriculum vitae, containing additional details regarding my career, is attached hereto as Exhibit "A."

2.  I am being compensated for this matter at $200 per hour for study and testimony, plus reimbursement of expenses.

3.  In preparing this Declaration, I have reviewed the following documents:

    a.    (Bates 62-171) WY–Assignment Conveyance and BOS, Sublette Co., WY

    b.    Certificate of Formation @ 2014 -8-03

    c.    Fossil 1994 Agreement

    d.    First Amendment to SWEPI PSA (2014-09-25)

    e.    Second Amendment to SWEPI PSA (2015-08-13)

    f.    1-23-90 Amendment

    g.    02 – Fossil 1994 Agreement - Amendment

    h.    02-LLC Agreement for UPL Pinedale (2014-08-13)

    i.    03-1996 PSA between CNG and Ultra Petroleum (USA)

    j.    03-Certificate of Authority in Wyoming (UPL Pinedale)

3

k.  4-15-88 Amendment

l.  5-7-86 Amendment

m.  6-22-88 Amendment

n.  17.01.05 Gasconade v Ultra Original Complaint

o.  17.02.21 Defendants' Original Answer Counterclaim

p.  17.03.17 Answer to Counterclaims

q.  2014-09-25 – Capital Contribution Letter (SWEPI Acquisition)

r.  2017-09-01 Cummings Expert Report - Gasconade

s.  Services Agreement by UPL Pinedale and Ultra Resources @ 2014-09-25

t.  SWEPI-UPL – Purchase and Sale Agreement (2014-08-13)

u.  Ultra Petroleum – Org Chart @ 2017-04-12

v.  Consulting Agreement dated 11/1/83 between Fossil and CNG

w.  05-2017 PSA between WPX Energy and UPL Pipeline

4.  After reviewing the above documents, I have formed opinions regarding Plaintiffs' allegations and claims that Ultra Resources, as successor in interest to CNG to certain properties in Sublette County, Wyoming, breached the 1994 Letter Agreement when UPL Pinedale purchased certain leases and wells in Wyoming from SWEPI and from WPX Energy RM Company without assigning Plaintiffs an overriding royalty in some of the leases. My opinions are based upon common and accepted oil and gas industry customs and practices and include the matters set forth below.

5.  Pursuant to a Consulting Agreement dated November 1, 1983 (Consulting Agreement"), Fossil Associates ("Fossil") agreed to provide services to CNG Producing Company ("CNG")

4

including giving CNG a first right of refusal to purchase oil and gas drilling prospects ("Prospects") originated and assembled by Fossil within a defined Area of Mutual Interest ("AMI") that covered lands in various counties and states in the Rocky Mountains and elsewhere (an "AMI" is an acquisition tool or provision that is incorporated into a written agreement between 2 or more parties that (1) defines a geographical area to which the AMI applies, and (2) requires an acquiring party of the specified types of oil and gas interests to offer to the non-acquiring party a percentage of the acquired interest). Fossils' services also included providing to CNG the geological and geophysical technical data it prepared or assembled that supported and/or identified a Prospect, Fossils' evaluation and analysis in support of the drilling of a Prospect well, the estimated costs of leasing and drilling a Prospect, and responsibility for the leasing of lands in a Prospect. In exchange for these services, Fossil was initially paid a monthly retainer fee of $21,500 by CNG to cover Fossil's overhead and salaries, and Fossil received other forms of consideration as well including, but not limited to, an overriding royalty on all leases acquired within the AMI, a 12.5% reversionary interest "after payout" (as defined in the Consulting Agreement), and the option to retain and participate with up to 12.5% of the acquired working interest in a Prospect.

6.   Pursuant to a Letter Agreement dated March 15, 1994, and referenced therein as the "Southwestern Wyoming Revised CNG/Fossil Agreement" ("Letter Agreement"), Fossil and CNG agreed that the Letter Agreement "…shall supersede and replace all previous agreements executed by the parties insofar, and only insofar, as such previous agreements relate to Sublette, Sweetwater, Lincoln and Uinta Counties in Wyoming, hereinafter referred to as the Contract Area, and specifically, but not limited to that certain Consulting Agreement dated November 1,

1983, as amended...". Therefore, the Letter Agreement both terminated and replaced the Consulting Agreement as to the named counties in Wyoming, including Sublette County, but it had no effect on the Consulting Agreement for leases, lands, wells, equipment and production outside of the Letter Agreement's Contract Area.

7.   The Letter Agreement further replaced Fossil's prior overriding royalties and other consideration with a fixed 5.5% overriding royalty on existing leases in the Jonah Gulch Prospect, and a 5.0% overriding royalty on existing leases in the Contract Area. The Letter Agreement also created a 9-section AMI surrounding each individual lease still in effect, or any of the leases in the AMI are still in effect, and eliminated the following:

> a.   The monthly $21,500 retainer fee paid to Fossil;
>
> b.   CNG's first right of refusal to buy Prospects generated by Fossil;
>
> c.   Fossil providing CNG with Prospect technical data and evaluations;
>
> d.   Fossil leasing Prospect lands;
>
> e.   Fossil receiving a reversionary interest after payout;
>
> f.   Fossil having the right to acquire up to 12.5% working interest in a Prospect;

Therefore, the Letter Agreement eliminated any and all services required for Fossil to provide to CNG, and eliminated CNG's payment of the required monthly retainer fee to Fossil. The Letter Agreement also provided for Fossil to receive a 5.0% overriding royalty on new leases acquired by CNG that lie within any AMI outside of the Jonah Gulch Prospect.

8.   Pursuant to a Purchase and Sale Agreement dated July 17, 1996 ("CNG PSA"), CNG agreed to sell to Ultra Petroleum (USA) Inc. the following:

a. The oil and gas leases listed on Exhibit A to the CNG PSA ("Leases") limited, however, to the lands described on Exhibit A ("Lands");

b. All property, production and rights incident to the Leases;

c. All wells associated with the Leases including, but not limit to, those listed on Exhibit B;

d. Gathering and flowlines;

e. Pipelines;

f. Facilities;

g. all other personal property, equipment and fixtures appurtenant thereto;

All of the above items are collectively called the "Interests". The Interests were sold to Ultra subject to the Letter Agreement but only insofar as the Letter Agreement "affected" the Interests.

9. Pursuant to a Purchase and Sale Agreement dated 8/13/2014, by and between SWEPI LP and Ultra Resources, Inc. and UPL Pinedale, LLC, SWEPI sold and assigned oil and gas producing properties it owned in Sublette County, Wyoming, to UPL Pinedale ("SWEPI PSA") and a Purchase and Sale Agreement dated 5/8/2017, by and between WPX Energy RM Company and UPL Pinedale ("WPX PSA"). It is through this acquisition that UPL Pinedale acquired producing wells and related leases from SWEPI and WPX that involved some of the lands offsetting the Interests Ultra Resources acquired from CNG. Plaintiffs claim some of these leases lie within AMI's created under the Letter Agreement, and that they are entitled to an overriding royalty on these leases from UPL Pinedale in accordance with the Letter Agreement. Ultra and UPL Pinedale dispute Fossil's allegations and claim.

7

10. After having reviewed the above case documents, I have developed the following opinions regarding the issues in this case:

a.   The Interests acquired by UPL Pinedale from SWEPI and WPX were not subject to the Consulting Agreement or the Letter Agreement.

b.   The Letter Agreement converted the consideration already earned by Fossil for services provided to CNG under the Consulting Agreement and replaced it with a fixed overriding royalty and a 9-section AMI surrounding each of the existing leases.

c.   In the CNG PSA, CNG assigned the Interests to Ultra Petroleum (USA) Inc., which was subsequently named Ultra Resources, Inc., subject to the terms and conditions of the Letter Agreement insofar as it affects the Interests. The Letter Agreement does affect the Interests in several ways because it provides for Fossil's retained overriding royalty in the Leases whether or not filed for record, and it also affects the Leases in that it provides should CNG decide to release or terminate a lease, that Fossil has the right to take over the lease. However, it is my opinion the Letter Agreement's AMI provision does not apply to the acquisition of new leases covering lands adjacent to the Lands described in the Leases after Ultra acquired the Interests from CNG. Therefore, it is my opinion that the Letter Agreement's AMI provision does _not_ affect the Leases assigned in the CNG PSA in that the AMI provision applies to the lands that lie outside of the Leases. Although Ultra may have subsequently acquired new leases in one or several of the AMI areas, and assigned Fossil an overriding royalty in same, I am of the opinion this was not necessary as they were under no obligation to do so.

d.  In the CNG PSA, CNG retained all properties, rights and interests under the Letter Agreement that were not assigned to Ultra Resources including all lands, leases, wells and production. In my opinion, the rights retained by CNG would also include the AMI's surrounding the Leases, and CNG would have a continuing obligation to give Fossil an overriding royalty on offsetting lands and leases that CNG should acquire in the AMI, not Ultra Resources.

e.  If the AMI provision in the Letter Agreement was intended to apply to Ultra Resources, an all-inclusive provision would be needed in the CNG PSA making it abundantly clear that the buyer is subject to _all_ of the terms of the Letter Agreement, "including but not limited to" the AMI provision, that the buyer accepts and agrees to be bound by these terms and conditions and that the seller agrees not to compete for a certain period of time. However, the CNG PSA does just the opposite and instead provides that Ultra Resources agrees to comply with the Letter Agreement "…_**insofar as it affects the Interests**_". Therefore, it limits the application of the terms and conditions to just the Interests and nothing more.

f.  The Assignment, Bill of Sale and Conveyance attached as Exhibit D to the CNG PSA states CNG is assigning "All of Assignor's right, title and interest in and to those certain oil and gas leases listed and described on Exhibit "A"…and in the contractual interests and other interests described in Exhibit "A" (all of which are herein called the "Leases") _insofar and only insofar as the Leases cover and relate to the lands described in Exhibit "A" (herein called the "Lands")._" The AMI lands all lie outside of the Lands described

in the Leases on Exhibit "A". Therefore, in my opinion, the AMI provision in the Letter Agreement does not apply to the Leases and Interests Ultra acquired from CNG.

g.  It is my understanding Ultra chose to have UPL Pinedale acquire the SWEPI properties in order to take advantage of SWEPI's post-production agreements. However, I do not think it makes any difference why they created UPL Pinedale. In this day and time there are many, many companies that have affiliates, subsidiaries, parent corporations or other related entities. The AAPL Model Form Operating Agreements[1] and the COPAS Accounting Procedures[2] both acknowledge and contain provisions dealing with related entities.

Companies use, or create, related entities for a variety of reasons including keeping an acquired company segregated and managed separately from its other companies for tax reasons, for environmental or other liability reasons, lender requirements, or to create a new company division (ex. – midstream, pipeline, energy trading, etc.). I have worked for companies that had such affiliates or related entities (Ex. - look at Exxon Corporation's acquisition of XTO in 2010 which it continues to maintain as a separate entity from its domestic E&P company since acquiring XTO). The Williams Cos. in Tulsa is a pipeline company that bought Northwest Pipeline in the mid-1990's. NWPL was a pipeline company, too, but it also owned and operated upstream E&P properties in the San Juan Basin. When Williams bought NWPL, they transferred the upstream properties into a newly created Williams Production Company. When I worked

---

[1] American Association of Professional Landmen Form 610-2015 Model Form Operating Agreement (Articles V.A, V.B,, V.D, and VIII.F)

[2] Council of Petroleum Accountants Societies 2005 Accounting Procedures (Articles I.C and II.7)

for Mesa Petroleum, Mesa bought Tenneco's Mid-Continent Division. Since Mesa borrowed most of the acquisition funds, the lenders required Mesa to create Mesa Midcontinent and place all of the properties into this new entity until the loan was paid down.

I have seen no evidence that indicates, much less proves, that the SWEPI or WPX properties were bought in the name of UPL Pinedale, LLC to avoid liabilities, or that it was a scheme to defraud Plaintiffs, or that Ultra Resources has stolen or converted any of Plaintiffs' overriding royalty production proceeds, or that Ultra Resources knew that Plaintiffs would expect to be compensated for the SWEPI or WPX properties.

It is my opinion that Ultra Petroleum had every right to create UPL Pinedale who would acquire the SWEPI and WPX properties, that creating new entities to transfer property interests into is very common in the oil and gas industry and done for a variety of reasons, that Ultra Resources had no duty or obligation under the Letter Agreement or CNG PSA to explain the creation of this new entity to Plaintiffs, and that there is no evidence that would show or indicate that UPL Pinedale was created to cheat Fossil out of any overriding royalties.

The AMI provisions in both the Consulting Agreement and the Letter Agreement contemplate the acquisition of _undeveloped leases_, primarily through federal government lease sales, for the purpose of identifying and creating a prospect, and drilling a prospect well. The SWEPI PSA and the WPX PSA  were acquisitions primarily of _producing properties_. At no time did Plaintiffs provide any services and/or other valuable consideration to Ultra Resources or UPL Pinedale that identified, generated, supported or

assisted either entity in UPL Pinedale's acquisition of the SWEPI or WPX properties. Another reason Ultra Resources did not recognize Fossil as being entitled to an overriding royalty on any of the SWEPI or WPX properties is while Ultra Resources may have viewed itself as being subject to the AMI provision in the Letter Agreement, UPL Pinedale does not. It is for this reason Ultra Resources and UPL Pinedale have refused to assign an overriding royalty interest in the properties acquired from SWEPI or WPX to Plaintiffs. I have further seen no evidence that Ultra Resources has mistreated Plaintiffs, that Ultra Resources has been unfair or inequitable in the way it has treated Plaintiffs, or that Ultra Resources has been unjustly enriched by depriving Plaintiffs of an overriding royalty they are clearly not entitled to.

11. In summary, it is my opinion that Ultra Resources acquired the Leases and Interests from CNG free and clear of the AMI provision in the Letter Agreement. Even though the PSA and related Assignment, Bill of Sale and Conveyance state the Leases, the Lands and the Interests are subject to the Letter Agreement, they are subject "only insofar" as the Letter Agreement "affects" **the Leases**. The PSA does not state that Ultra is subject to _all_ of the provisions of the Letter Agreement, only those affecting the Leases and Interests. Nor did I see any provisions whereby Ultra Resources agreed to be subject to an AMI with Fossil

To emphasize my point, what if the Letter Agreement between Fossil and CNG had a Contract Area and AMI covering the entire State of Wyoming? After buying hundreds of leases and drilling dozens of wells over several years, assume CNG decides to sell one well and four related leases to Ultra. Both a PSA and an Assignment state the assigned property is "subject to the Letter Agreement". In this case Plaintiffs and their Expert Witness would have you believe

that Ultra Resources is subject to the entire Letter Agreement, *including the AMI*, and that should Ultra Resources or any other Ultra entity should buy any leases *anywhere* in the State of Wyoming, Ultra or the acquiring entity would owe Fossil a 5.0% overriding royalty on all of such acquired leases. Think about that in comparison to the language in the PSA in this case which states the Leases and Interests are subject to the Letter Agreement *but only insofar as the it affects the Leases and Interests*, keeping in mind that the AMI provision doesn't affect the Leases or Interests; the AMI only applies to the lands offsetting the Leases.

Or, what if ExxonMobil had an AMI with Company A that gave Company A an overriding royalty on all new leases acquired by ExxonMobil in several counties in Wyoming. Exxon purchases a company called XTO who already owns leases in several of the AMI areas. Company A had nothing to do with the ExxonMobil acquisition and provided no geological or geophysical services or data, technical evaluations, recommendations or services of any type with respect to the acquisition. Once again, Plaintiffs and their expert witness would have you believe that Company A is entitled to an overriding royalty on all of the XTO leases that lie within the AMI even though XTO continues to own title to and manage the properties as a separate entity.

The AMI provisions in both the Consulting Agreement and the Letter Agreement contemplate the acquisition of oil and gas leases through leasing activities in approved Prospects. Most of the parties' leasing activities involved leases acquired from the federal government at government lease auctions which Plaintiffs were expressly made responsible for handling. The AMI provisions did not mention anything about the acquisition of royalties, overriding royalties, working interests, producing properties, minerals, production payments or net profits interests

which are usually associated with large property acquisition packages. It is industry custom and practice to list every one of these types of interests separately in AMI provisions if the AMI provision is to apply to them. In this case, UPL Pinedale acquired producing property packages from SWEPI and WPX that included leases, both producing and non-producing. There were no leasing activities ever conducted by Plaintiffs, CNG or Ultra in connection with the leases or properties UPL Pinedale acquired from SWEPI or WPX. The AMI, therefore, did not apply to any of the leases or properties subject to the SWEPI PSA or the WPX PSA.

12.     Lastly, I am also of the opinion that an open-ended term to an AMI provision is a violation of the Rule Against Perpetuities. Without a fixed term, a provision like the AMI provision in the Letter Agreement could remain in effect indefinitely. Although open-ended AMI terms are occasionally seen in contracts and agreements, the industry custom and practice is to oppose and avoid such terms due to the problems and confusion they often create between the parties, or their successors or assigns.

13.     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Oklahoma City, Oklahoma this 26th day of September, 2017.

*/s/ Dorsey T. Roach*
Dorsey T. Roach, CPL
Managing Member/Owner
UnitPro Land Consultants, LLC

# EXHIBIT "A"

# DORSEY T. ROACH, CPL

**12101 N. MacArthur Blvd., Suite A-148**                              **(405) 301-5068**
**Oklahoma City, OK 73162**

---

**EDUCATION**     **Bachelor of Business Administration**, *University of Oklahoma*, Norman, Oklahoma (1977), majoring in Petroleum Land Management

**Heritage Hall College Preparatory School,** Oklahoma City, Oklahoma (1972)

**RELEVANT**     **UnitPro Land Consultants, Inc.,** Tulsa, Oklahoma (2004-2006), and
**EXPERIENCE**   **UnitPro Land Consultants, LLC**, Oklahoma City, Oklahoma (2006 – Present)
*Managing Member/Owner* (2004 – Present)
• Expert witness services for O&G litigation
• Prepare and negotiate Operating Agreements, Exploration Agreements, Participation Agreements, Well Trades and other land contracts for clients
• Conduct seminars for industry organizations and companies

**Cheyenne Petroleum Company,** Oklahoma City, Oklahoma
*Area Land Manager* (2006-2009)
• Processed exploration and development prospects and projects in Canada and the Midcontinent, Gulf Coast, South Texas and Ohio Basin regions of the U.S. for possible company participation
• Prepare and negotiate land contracts including, but not limited to, Confidentiality Agreements, Exploration Agreements, Participation Agreements, Operating Agreements and Well Trades
• Seek prospect and/or project participation opportunities

**The Williams Companies**, Tulsa, Oklahoma
*Director of Land* (2001-2004), *Land Manager* (2000-2001)
• Managed a land department (landmen, lease records and division order analysts) consisting of 25 employees
• Responsible for hiring and training land department personnel
• Prepared and managed both G&A and capital budgets for department
• Negotiated major land deals including Exploration Agreements, Participation Agreements and Operating Agreements
• Coordinated and managed land due diligence on all major acquisitions and divestitures
• Generated strategies and ideas for growth and expansion of the E&P organization in the Gulf Coast, South Texas, Midcontinent, San Juan Basin and Green River Basin
• Developed strategies for an active lease acquisition and horizontal drilling program in the Hartshorne CBM and Caney Shale plays in the Arkoma Basin

15

**Union Pacific Resources Company**, Fort Worth, Texas
*Staff Landman* (1997-2000)
• Assisted team and management in developing strategies for active horizontal
  drilling program in the Austin Chalk play of East Texas
• Supervised lease brokers involved with lease acquisitions and title curative
• Negotiated and prepared land contracts with industry partners including
  Operating Agreements and Well Trades
• Responsible for compliance with regulatory rules, regulations and orders
• Served as a mentor and helped train entry-level landmen

**Crawley Petroleum Corporation,** Oklahoma City, Oklahoma
*Land Manager* (1994 – 1997)
• Managed a land department consisting of 4 employees
• Supervised lease brokers involved with lease acquisitions and title curative
• Negotiated and prepared all land contracts with industry partners including
  Exploration Agreements, Participation Agreements, Operating Agreements and
  Well Trades
• Responsible for compliance with regulatory rules, regulations and orders
• Active in the Anadarko Basin, Anadarko Shelf, Golden Trend, Nemaha Ridge,
  Texas Panhandle, Permian Basin and Powder River Basin

**Mesa, Inc.,** Dallas, Texas; Amarillo, Texas
*Land Supervisor* (1991-1994), *Senior Landman* (1987-1991)
• Areas of responsibility included Oklahoma, Louisiana, Powder River Basin,
  San Juan Basin and Gulf of Mexico
• Supervised lease brokers involved with lease acquisitions and title curative
• Negotiated and prepared land contracts with industry partners including
  Participation Agreements, Operating Agreements and Well Trades
• Responsible for compliance with regulatory rules, regulations and orders
• Coordinated and managed land due diligence on Tenneco acquisition, and
  Midcontinent and San Juan Basin divestitures

**Exxon Corporation,** Houston, Texas; Oklahoma City, Oklahoma; Midland,
Texas; Los Angeles, California, Anchorage, Alaska (temporary assignments)
*Senior Petroleum Landman* (1986-1987), *Land Supervisor* (1982-1986),
*Senior Landman* (1981-1982), *Landman* (1977-1981)
• Supervised pooling and unitization land staff consisting of 10 employees
• Negotiated and prepared land contracts with industry partners including
  Participation Agreements, Operating Agreements and Well Trades
• Responsible for compliance with regulatory rules, regulations and orders
• Trained entry-level landmen
• Assisted management in developing strategies for active drilling program in the
  Anadarko Basin following Penn Square Bank failure
• Areas of responsibility included Midcontinent (1981-1987) and
  California/Alaska (1977-1980)

**OTHER**
**EXPERIENCE**

• **University of Oklahoma,** Petroleum Land Management (PLM) Program
  • *Adjunct Professor* (1983-2009), Topics included pooling, unitization, operating agreements, regulatory agencies, title opinions, title curative, and land administration
  • *Chairman*, Steering Committee (1995-1997), responsible for designing the restructuring of the PLM Program into the Energy Management Program

• **The University of Tulsa**, Energy Management Program
  • *Adjunct Professor* (2007 – 2015), Topics include Pooling, Unitization, Well Trades and Operating Agreements

• **American Association of Professional Landmen**
  • *Seminar and CPL Review Instructor* (1984-Present)
    • Topics include Pooling, Unitization, Operating Agreements, Well Trades and Participation Agreements
  • *Institute and Conference Speaker* (1985-Present)
    • Various topics and issues relating to Operating Agreements

• **Conference and Institute Speaker**
  • Oklahoma, Texas, Kansas and Arkansas Energy Bar Associations
  • Council of Petroleum Accountants Societies (COPAS), North American Petroleum Accountants Conference (NAPAC)
  • Numerous local/regional landman organizations
  • Numerous regional and national industry organizations

**MEMBERSHIPS**

• **American Association of Professional Landmen** (1977-Present)
  • *Certified Professional Landman* (1986-Present)
    • CPL No. 3311
  • *Chairman*, 1989 Operating Agreement Revision Committee
  • *Member*, 2002 Operating Agreement Task Force (CBM Modifications)
  • *Member*, 1989 (Horizontal) Operating Agreement Task Force
  • Member, 2015 Operating Agreement Task Force
  • *Chairman*, Model Form Participation Agreement Drafting Committee

• **Oklahoma City Association of Professional Landmen** (1981-Present)
  • *Chairman,* Industry and Regulatory Affairs Committee (1984)
  • *Secretary* (1985)
  • *Treasurer* (1986)
  • *Co-Chair*, Governmental Action Committee (2008-2009)

• **Tulsa Association of Petroleum Landmen** (2000-Present)
  • *President* (2004-2005)
  • *Chairman*, Education Committee (2000-2004)
  • *Chairman,* Scholarship Committee (2001-2005)

• **Adams Society Member**, Price College of Business, University of Oklahoma (inducted in 2012)

**Published Articles in Past 10 Years**

1. *The Maintenance of Uniform Interest Provision – Are You at Risk?*
   Presented to and published by the American Association of Petroleum Landmen
   June 1999 (1st publication)

2. *Evolution of the AAPL Form 610-Model Form Operating Agreement*
   Presented to and published by the American Association of Professional Landmen
   January 1984 (1st publication)

3. *JOA Calculations – What Happens When a Lease Goes Bad*
   Presented to and published by the National Association of Lease and Title Analysts
   September 2007

4. *Current Issues Involving Operating Agreements*
   Presented to and published by the American Association of Professional Landmen
   September 2003 (1st publication)

5. *The 2005 COPAS Accounting Procedure – Is It Really Better?*
   Presented to and published by the Council of Petroleum Accountants Societies of
   North America
   April, 2008 (1st publication)

6. *Exploration Agreements, Participation Agreements and Operating Agreements - What
   Every Landman Should Know*
   Presented to and published by the American Association of Professional Landmen
   December, 2009 (1st publication), February 2010

7. *JOA's, Exploration Agreements and Participation Agreements - What's the Difference?*
   Presented to and published by the Arkansas Bar Association
   February, 2010

8. *Select Issues Involving Operating Agreements*
   Published in <u>The Landman</u> (American Association of Professional Landmen magazine)
   September/October 2010

9. *Joint Operations in Down Economic Times: Practical Applications for the New 2015
   JOA*,
   Presented to and published by the American Association of Professional Landmen
   AAPL 2016 Annual Conference, Orlando, Florida

10. *What's New In the 2015 Form?* (co-authored with Fred MacDonald, J.D.)
    Presented to and published by the Rocky Mountain Mineral Law Foundation
    RMMLF Institute on the New AAPL 2015 Model Form Operating Agreement,
    November 2016, Houston, Texas

## PRIOR TESTIMONY

1.    Case:   **David L. Blake, et al v. Cabot Oil & Gas Corporation, et al** (Cause No. 06-2-8965-VC, 24th Judicial District Court, Goliad County, Texas)
   Client: Cabot Oil & Gas Corporation (Farnsworth & VonBerg)
   Issue:   Was geologist entitled to overriding royalty on new leases?

2.    Case:   **Longfellow Exploration Partners Limited, et al v. SandRidge Energy, Inc., et al** (Case No. 4:09-cv-00045-RAJ, U.S. District Court, Western District of Texas, Pecos District)
   Client: SandRidge Energy, Inc. (Locke Lord Bissell & Liddell)
   Issue:   Were drilling obligations created by provision added to JOA?

3.    Case:   **Marbob Energy Corporation, et al v. BP America Inc., et al** (Case No. CV-2010-647 and Case No. CV-2010-648, 5th Judicial District Court, Eddy County, New Mexico)
   Client: Marbob Energy Corporation and Concho Energy (Cotton Bledsoe Tighe & Dawson)
   Issue:   Were Marbob et al entitled to preferential rights when BP sold properties to Apache simultaneous with Marbob, et al selling their rights in the same properties to Concho? Was BP entitled to a preferential right on the Marbob, et al interests in these same properties?

4.    Case:   **Hawkins & Hawkins v. Nance Petroleum Corporation** (Case No. 2007-C-012, District Court, Northwest Judicial District, State of North Dakota, County of McKenzie)
   Client: Hawkins & Hawkins (Poulson, Odell & Peterson)
   Issue:   Was Hawkins' overriding royalty reduced for subsequent wells under Farmout Agreement and JOA?

5.    Case:   **Bishop Petroleum, Inc. v. Indian Oil Company, et al** (Case No. 2009-34720, District Court of Harris County, Texas)
   Client: Indian Oil Company, et al (Farnsworth & VonBerg)
   Issue:   Were Bishop et al liable for costs of workover?

6.    Case:   **Carbon Economy, LLC, et al v. SM Energy Company, et al** (Case No. CV-11-4, District Court of Beckham County, Oklahoma)
   Client: SM Energy Company (Wilguess & Garrett)
   Issue:   Was Carbon or SM Energy the designated operator under a JOA? Was Exxon assignment limited to wellbore rights only?

7.    Case:   **Cardinal River Energy, et al v. Unit Petroleum Company, et al** (Case No. CJ-2008-7388, District Court of Oklahoma County, Oklahoma)
   Client: Cardinal River Energy et al (Kirk & Chaney)

Issue:  Was JOA amended to cover deep rights thereby giving parties uniform interest as to all depths? Was Unit entitled to propose well and apply cost allocation between shallow and deep owners?

8.    Case:  **Roger Wheeler, et al v. Crest Resources, Inc., et al** (Case No. CJ-2010-6340, District Court, Tulsa County, Oklahoma)

Client: Crest Resources, Inc. (Conner & Winters)

Issue:  Pursuant to the terms of a Participation Agreement and JOA, did Plaintiffs have the right to participate in infill wells when they didn't participate in the initial test well in the unit? Did operator provide all required well information to Plaintiffs? Does a party to a JOA have the right to split their election?

9.    Case:  **Sally Stanford v. Jack Stanford Estate, et al**

Client: Sally Stanford

Issue:  Was the amount charged to a trust for landman services associated with organizing files and preparing assignments and deeds, a fair and reasonable amount, or was it excessive?

10.    Case:  **Crimson Exploration, et al v. Allen Drilling Acquisition Company, et al** (Cause No. 12,991, District Court, Madison County, Texas, 278th Judicial District)

Client: Allen Drilling Acquisition Company, et al

Issue:  (1) May an operator both deem a defaulting party as non-consent as to the amounts owed, _and_ sue the defaulting party for the amounts owed, under a 1989 JOA?

(2) Did a new JOA with a 3rd party that was depth limited and covered a smaller geographical area replace the entire old JOA that covered all depths and a larger geographical area?

11.    Case:  **Wicklund Petroleum v. Thomas Meason**

Client: Wicklund Petroleum (Mitchell DeClerck Firm)

Issue:  Was an overriding royalty to be earned by a geologist on a well-by-well basis or for all wells in a prospect basis.

12.    Case:  **Union Pacific Railroad and Ivy Energy, Inc. v. Williams Production RMT Co., et al** (Case No. 10cv371, District Court of Garfield County, Colorado)

Client: Ivy Energy, Inc.

Issues: (1) did operator have the authority to make unilateral changes to a participant's interest in wells? (2) was operator in compliance with JOA for suspending production revenues of a participant?; (3) was a participant entitled to 100% recoupment of well costs after title failed on a producing well?;

13.    Case:  **Enduro Operating LLC v. Echo Production, Inc., et al** (Case No.: D-503-CV-2013-134, Fifth Judicial District Court, Eddy County, NM)

Client: Echo Production, Inc.

Issue:  (1) was actual drilling required by the JOA for a subsequent
well, or just drilling operations? (2) Were drilling operations timely commenced?

14.     Case:   **Summa Engineering, Inc. v. Venus Energy, LLC, et al** (Case No. CJ-2012-10,
District Court, Grant County, Oklahoma)
Client: Venus Energy, LLC, et al
Issue:  Was the operator liable to the non-operators because the company man he
employed was inexperienced and unsupervised, and the company man's lack of
knowledge and experience resulted in bad decisions causing wellbore damage and
lost opportunities?

15.     Case:   **Kenneth W. Cory, Ltd. V. Apache Corporation** (Case No. CJ-2014-1, Roger
Mills County District Court, State of Oklahoma)
Client: Kenneth W. Cory, Ltd.
Issue:  Does an overproduced party have the right to ignore an operator's Gas Balancing
Statements during the life of a well but then claim errors were made over 30 years
ago and demand and receive adjustments to the operator's Final Gas Balancing
Statement, or does the overproduced party only have a reasonable time to
challenge the accuracy and correctness of the statements?

16.     Case:   **Osage Exploration & Development, Inc., et al vs. Stephens Energy Group,
LLC** (Case No. CJ-2014-239, Logan County District Court, State of Oklahoma)
Client: Osage E&D, Inc., U.S. Energy Development Corporation
Issue:  Did the assignee of the operator's interest under a JOA have the right to assume
operatorship of the wells even though 2 or more parties owning a majority in
interest under the JOA voted for an existing party to the JOA to assume
operatorship?

17.     Case:   **Mardan Energy Corporation, et al vs. Faulconer 1996 LP, LLP, et al** (Cause
No. 10-12363-278-06, District Court, Madison County, Texas)
Client: Crimson Exploration, Inc., Crimson Exploration Operating, Inc. Gulfwest Oil
Company and Gulfwest Oil & Gas Company
Issue:  Absent an AMI provision being added, does the AAPL Model Form JOA contain
language that establishes an AMI?

18.     Case:   **Clovelly Oil Co., LLC vs. Midstates Petroleum Company, LLC** (Case No.
70728, Division B, 13th Judicial District Court, Parish of Evangeline, State of
Louisiana)
Client: Midstates Petroleum Company, LLC
Issue:  Are there any provisions contained in a standard AAPL Model Form JOA that
obligate a party to share in new lease acquisitions with the other parties to the
JOA absent an AMI provision being added to the JOA?

19.     Case:   **Anderson Energy Corporation, et al vs. Dominion Oklahoma Texas
Exploration & Production, Inc., et al** (Sutton County, Texas District Court,
Cause No. 0005419)

Client: EnerVest Operating, LLC
Issue: Was a 1980 Letter Agreement and JOA still in force thereby obligating successors to the original parties to offer new lease acquisitions and the opportunity to participate in wells drilled thereon, or did these contracts terminate once there was no longer joint operations or uniformity of ownership?

20.   Case:   **Encana v. Vanguard**, (U.S. Bankruptcy Court, Southern District of Texas, Houston, Texas, Case No. 17-30560)
Client:  Encana Oil & Gas (USA) Inc.
Issue:   Was a drilling and development agreement between the parties an operating agreement or a farmout agreement for determining whether or not it was an executory contract for bankruptcy purposes?